THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CORNELIA THOMPSON, Defendant-Appellant.

First District (5th Division)    No. 79-841

Opinion filed March 6, 1981.

James J. Doherty, Public Defender, of Chicago (Aaron L. Meyers, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Richard Burke, and Robert J. Kaiser, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4) and attempt armed robbery (Ill. Rev. Stat. 1977, ch. 38, par. 8—4) and was sentenced to a term of two years' probation with the first 30 weekends to be spent in the House of Corrections. On appeal, she contends that: (1) she was arrested without probable cause in violation of the fourth amendment to the United States Constitution; (2) the police arrested her inside her home without an arrest warrant or probable cause, and the entry into her home was without consent or exigent circumstances in violation of the fourth amendment; (3) the trial court erred in denying her motion to suppress identification evidence resulting from unnecessarily suggestive pretrial identifications of her in a photographic display and a lineup; (4) the closing argument of the prosecutor was improper; (5) the trial court erred

in its decision to give a supplemental instruction to the jury; and (6) she was not proved guilty beyond a reasonable doubt.

At the evidentiary hearing conducted on defendant's motion to quash her arrest and to suppress identification evidence, the following pertinent evidence was adduced.

At approximately 9:30 p.m. on March 3, 1977, Claire Toth was walking home from work when her purse was grabbed from behind. She turned and saw three black females behind her. Defendant was approximately an arm's length away, and the other two remained farther behind. Defendant said, "Give me your purse, bitch." Toth replied, "No, you're crazy." As Toth moved backwards, defendant stabbed her with a knife in the left arm. Toth screamed and pulled a whistle out of her purse and blew it. The three assailants fled without the purse. Toth testified the whole incident lasted one minute and she faced defendant almost the entire time. The area was illuminated by street lights and possibly building lights.

Nicholas Jordan heard the scream and the whistle and saw two or three women running down the street. He watched them enter a black over gold late model Cadillac with Illinois license plates 827 877. There were a total of four or five people inside the car, including a male driver. He asked them "Who blew the whistle," and one of the women said, "Some girl back there." The car then drove away.

At the scene of the attack and subsequently at the police station, Toth described the woman to the police investigators who stabbed her as a young black woman, approximately 20 years old, a darker complexion than her own, slender, and weighing 115 to 120 pounds, wearing a yellow plaid winter coat, "a natural, and a type cap that covered her hair." Her attacker was a few inches taller than herself at 5'5".

On March 4, 1977, Officer Richard Crowle ascertained that the car seen by Nicholas Jordan was owned by a John Thomas. He spoke with John Thomas and told him of the attack on Toth and that his car had been identified at the scene. John Thomas told him that his son, Eric, had the car on the evening of March 3. According to Thomas, Eric was with his girl friend, the defendant, that evening.

Between 10 a.m. and 11 a.m. on March 5, 1977, Investigator Crowle spoke with Eric at the Thomas home. Eric admitted he used his father's car on the evening of March 3, but said he and his girl friend Cornelia Thompson along with two other girls saw a movie in downtown Chicago. He was with Cornelia Thompson from 8 p.m. until 3 or 4 in the morning. He did not remember the name of the movie, the names of the other girls or where they lived, or where he had left them off. Eric described the other girls as in their early twenties and dressed in dark street clothes.

Crowle concluded that Eric's story was unbelievable and placed him under arrest.

Officer Crowle then proceeded to defendant's apartment, but she was not at home. He then went to the police station across the street, and left directions with the tactical unit that he was seeking defendant in connection with a robbery attempt. He described her to the police officers as "a young girl in her early 20's, about 5'7", 120 pounds, medium brown skin." Crowle directed the officers to arrest defendant. In his opinion, her arrest was justified because Eric Thomas had used her as part of his alibi which Crowle found to be totally unbelievable. Crowle stated: "Well he was using her as an alibi and it was my assumption that she was with him at the time of the robbery."

At approximately 1 p.m. on March 5, 1977, Police Officer Alex Kaider and two other plainclothes officers pursuant to Crowle's orders went to defendant's apartment. They did not have their guns drawn nor did they have a search warrant, but when they went to the apartment, they knew that defendant was wanted for robbery, and that she was a black female, approximately 18 years old and medium complected. When they knocked on the door a woman fitting the description left by Crowle answered. Standing on the threshold outside the apartment, Officer Kaider identified himself as a police officer, and asked if she was Cornelia Thompson. She answered yes. Kaider told her she was wanted for robbery and was under arrest. Defendant asked if she could get her purse and moved back into the apartment. The police officers followed her inside and watched her get the purse. Before leaving the apartment they searched her purse. Nothing was found in the purse. They did not search the apartment.

At the police station, defendant told one officer that on the evening of March 3, 1977, she went to the Chicago Theatre with her boyfriend and saw the movie "Centennial." After defendant was arrested Investigator Crowle took a photograph of defendant at the police station. Crowle then showed Claire Toth a display of 12 or 13 photographs including the recent photograph of defendant. After viewing the spread out photographs, Toth chose three photos that resembled her attacker. One of these three she described as the one "most likely" to be her attacker. It was the photo of defendant. When Crowle asked her if she could make a positive identification from people instead of photos, she said she could. Crowle stated that he would have preferred to conduct a lineup, but was unable to conduct one because of an insufficient supply of suitable participants.

After conferring with an assistant state's attorney, Crowle decided to hold defendant in custody for a lineup. The lineup was conducted approximately between 8 p.m. and 10 p.m. and contained five black females. Defendant was wearing the same clothes at the time of the lineup

as when her photograph was taken that afternoon. Upon viewing the lineup, Toth identified defendant as her attacker. Toth stated that at the time of the lineup she was not thinking of the photographs she had previously selected, but that her identification of defendant was based on her viewing of the defendant on the night of the attack. Crowle did not produce the photographs used in the photographic display on March 3, 1977, when he testified at the suppression hearing. The trial court denied defendant's motions to quash her arrest and to suppress identification evidence.

At trial essentially the same facts were adduced along with the following additional relevant testimony.

Claire Toth testified that when she was attacked on March 3, 1977, the area was illuminated by street lights and a nearby building light. She said it was "bright enough to see what's happening, but sometimes the colors are a little distorted." She described the defendant as dark complected. Two women were standing behind defendant at the time of the attack, and one of them, along with defendant, held a knife in her hand.

Diane Woods Herard, defendant's friend for 2½ years, testified that in January 1977 she began to record her daily events in a diary. She used this book to recall the events of March 3, 1977. That evening, she, defendant, and three male friends were at her house. They remained inside the house from 3 in the afternoon until 12:30 a.m. Defendant stayed until the next morning. She never saw defendant wearing a yellow coat, and stated that defendant did not own one.

On the morning of March 5, 1977, defendant called Diane and told her that Eric Thomas, defendant's boyfriend, had called her earlier that morning. Defendant related to her the content of that conversation. Several days later, she learned that defendant had been arrested. It was not until a week before trial, over a year after the incident, that she learned she was to be a witness in this case.

Defendant testified on her own behalf. She was 5 feet 8½ inches tall and weighed 132 pounds. On March 3, 1977, she was at her friend Diane Woods Herard's home from 3 p.m. until the next morning. She did not see her then boyfriend on March 3, 1977, and did not attack or attempt to rob Claire Toth. She further testified that Eric Thomas called her on Saturday, March 5, 1977, at 6 a.m. He told her that if anyone asked her where he had been on March 3, 1977, she should say that they went to a movie together in downtown Chicago. After she was arrested and taken to the police station, she told this story to the police. After her arrest on March 5, 1977, she had ended her relationship with Eric Thomas although she continued to protect him at the pretrial hearings on November 2, 1978. She continued to tell this story until the day of trial in order to protect him.

She decided to tell the truth at trial because, in her words, "the truth would help me more than a lie would."

The jury retired at approximately 2:20 p.m. for deliberations. Sometime thereafter, the court received a note from the jury which read, "We have reached an impasse." The jury was then called back to the courtroom, and the court said, "My instructions to you now are to continue to deliberate. Go back to the jury room. You are excused. Back to the jury room." Following more deliberations, the jury sent a second note to the court. It read: "We are a hung jury. No matter how long we deliberate our polled vote is eight guilty, two not guilty, two undecided." The court again brought the jury back to the courtroom and gave them a supplemental instruction which in form was consistent with the instruction approved by our supreme court in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731, and then told the jury they would continue to deliberate until 9:45 p.m. at which time they would be sequestered at the Holiday Inn overnight to return the next morning for further deliberations. At 9:15 p.m. the court informed the jury to gather their belongings and prepare to proceed to the Holiday Inn. Defense counsel's motion for a mistrial was denied. At 11:10 a.m. the next day the jury returned verdicts of guilty on two counts of aggravated battery and one count of attempt armed robbery.

OPINION

Defendant first contends that the police lacked probable cause to arrest her, and therefore the arrest was in violation of the fourth amendment to the United States Constitution. From this premise, defendant maintains that the out-of-court and in-court identifications of her "resulted from exploitations of the illegal arrest" and evidence of these identifications should have been suppressed under the exclusionary rule. (See *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) More specifically, defendant believes the arrest was an illegal investigative arrest based on the suspicion of Investigator Crowle and a general description provided by the victim. The State, however, claims that the record from the pretrial hearing and the trial establishes that the police had probable cause to arrest defendant.

■■ A police officer has probable cause to arrest without a warrant, "when the facts and circumstances within his knowledge and of which he has reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty." (*In re Woods* (1974), 20 Ill. App. 3d 641, 647, 314 N.E.2d 606, 610.) Whether probable cause for an arrest exists depends upon the totality of the facts and circumstances

known to the arresting officer when the arrest is made. *(People v. Gwin* (1971), 49 Ill. 2d 255, 274 N.E.2d 43.) In deciding the question of probable cause, courts are not disposed to be unduly technical, and the determination is to be based on the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. The information upon which an arrest may be made is less than is necessary to secure a conviction. *(People v. Faulisi* (1977), 51 Ill. App. 3d 529, 366 N.E.2d 1073.) Where a trial court conducts a lengthy hearing on this issue and determines that the officers had probable cause to arrest the defendant, courts of review will not disturb this finding unless manifestly erroneous. *(People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) A ruling on a motion to suppress is not final and may be changed or reversed at any time. *(People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808.) Consequently, a reviewing court in passing upon the trial court's ruling may consider testimony adduced at trial as well as at the pretrial hearing. *People v. Wade* (1979), 71 Ill. App. 3d 1013, 389 N.E.2d 1230.

Defendant contends that her arrest was improperly based on the "mere suspicion" of Investigator Crowle *(People v. Vogel* (1978), 58 Ill. App. 3d 910, 374 N.E.2d 1152) and the inadequate general description of her by the victim. *(People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574; *People v. Williams* (1977), 53 Ill. App. 3d 266, 368 N.E.2d 679.) In our opinion the police had probable cause to arrest defendant. First, a witness positively placed the car of John Thomas at the scene of the crime. The car contained at least one man who was the driver, and two or three young black women. Claire Toth had just been attacked by three young black women. Upon tracing the license plate number of the car, Investigator Crowle spoke with the owner of the car, John Thomas. Thomas told him that his son, Eric, had the car on the night of March 3, 1977, and that Eric was with his girl friend, the defendant, that evening. Crowle then spoke with Eric Thomas. Eric told Crowle that he used the car to see a movie with his girl friend, Cornelia Thompson, and two other girls. He could not, however, tell Crowle the name of the movie which he had seen approximately 36 hours before, the names of the girls who were with him, where they lived, or where he had left them off that night. In light of these failures of memory, Crowle reasonably concluded that Eric Thomas was lying and that defendant was involved.

■■ Crowle then proceeded to defendant's apartment. Finding that she was not home, Crowle left directions at the nearby police station to arrest defendant in connection with an attempt robbery. Crowle described defendant to the officers at the station as "a young girl in her early 20's, about 5'7", 120 pounds, medium brown skin." Claire Toth had previously described the woman who stabbed her as a black female, approximately

20 years old, about 5'7" or 5'8" and weighing 115 to 120 pounds. Later that day, March 5, 1977, Officer Kaider went to defendant's apartment and knocked on her door. The door was opened by a black female approximately 18 years old and medium complected. She matched the description of defendant provided by Crowle. She identified herself as Cornelia Thompson and Kaider told her she was under arrest. Defendant matched the description provided by the victim. We conclude that the trial court's ruling finding probable cause was not manifestly erroneous. *People v. Clay.*

Defendant next argues that she was illegally arrested within her home, and the police did not have a warrant, or probable cause or exigent circumstances. As a result of the illegal arrest, she was identified both out-of-court and in-court, and that evidence should have been suppressed. (*Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) To support her position, defendant refers us to *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, which holds that in the absence of exigent circumstances, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment to the United States Constitution. The State offers four counterarguments: first, the *Payton* holding should not be applied retroactively to the present case; second, the police did not enter defendant's apartment at the time of the arrest; third, defendant failed to prove that the subsequent entry into her apartment was nonconsensual; and, fourth, there were exigent circumstances allowing the police to arrest defendant in her apartment.

As to the first, retroactivity of the *Payton* holding was previously decided by this court in *People v. Robinson* (1980), 91 Ill. App. 3d 1138, 415 N.E.2d 585. In *Robinson,* we concluded "that *Payton* did not alter the law in Illinois governing warrantless entries into homes for the purpose of making an arrest." (91 Ill. App. 3d 1138, 1142.) Our conclusion in *Robinson* was premised on two Illinois decisions: *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543; and *People v. Genus* (1979), 74 Ill. App. 3d 1002, 393 N.E.2d 1162. In *Abney,* our supreme court held that Illinois law prior to *Payton* required both probable cause and exigent circumstances to justify a warrantless entry into a person's home to make an arrest. In *Genus,* the court recognized consent as an established exception to the warrant requirement of the fourth amendment. Having analyzed these cases, we stated:

> "Reading *Abney* and *Genus* together, we are of the opinion that prior to *Payton,* in this jurisdiction, a warrantless entry into a citizen's home to make an arrest did not violate the fourth amendment if exigent circumstances were present or the entry was

consensual. Thus, the principle enunciated in *Payton* merely reaffirms the position previously taken by our courts." (*People v. Robinson* (1980), 91 Ill. App. 3d 1138, 1142-43.)

Since we have determined that probable cause existed to arrest defendant, we must now decide whether the police entered defendant's apartment to effectuate the arrest, whether the alleged entry was consensual, and whether the alleged entry was made under exigent circumstances.

According to the State, the police arrested defendant while she was standing in the doorway and they were positioned in the hallway. The subsequent entry into the apartment was after the arrest had taken place and an accommodation to allow defendant to get her purse. This entry, says the State, is separate and distinct from the arrest. Defendant maintains that this argument ignores the realities of police practice and everyday life. According to defendant, the police entered her apartment not to accommodate her, but rather to effectuate her arrest. The arrest was not complete until the police had exercised some control over her movement and freedom, this all occurring inside the apartment. In our view, even assuming there was an entry to effectuate defendant's arrest, defendant has failed to prove the entry was nonconsensual or that there were no exigent circumstances.

■■ Defendant has the burden of proof in a motion to quash an arrest. (*People v. Potts* (1978), 58 Ill. App. 3d 550, 374 N.E.2d 891.) A reviewing court will not disturb the decision of the trial court unless it is manifestly erroneous. (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.) Defendant did not testify nor was she asked whether she consented to the officers' entry into her apartment. The record is clear that the police knocked on the door, the defendant answered, admitted her identity and the police announced she was under arrest. She did not object or resist or attempt to flee. Instead, she asked permission to get her purse. Defendant failed to sustain her burden of proof on this point.

A warrantless arrest of a defendant inside his or her home may be permitted where exigent circumstances exist which would justify the officer's decision to proceed without a warrant. (*Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371; *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543.) The following factors are to be considered in determining whether exigent circumstances exist:

" '* * * (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause * * * to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.' [Cita-

tions.]" *People v. Sakalis* (1980), 85 Ill. App. 3d 59, 65-66, 405 N.E.2d 1121, 1127.

Additional factors which our supreme court described in *Abney* as worthy of "special mention" are: (1) prompt action by the officers in proceeding to arrest defendant after having gained information establishing probable cause; (2) no delay or unjustified time during which time a warrant could have been obtained; and (3) a belief that the suspect was armed and exhibited some sign of a violent character. (*People v. Abney.*) These factors need not all be present; rather, they need only be satisfied on balance. *People v. Sakalis.*

■■ In the present case, defendant was suspected of a violent crime, *i.e.*, the stabbing of Claire Toth. Although only one of three women who confronted Claire Toth actually stabbed her the other two women were clearly accessories to this violent act. The police therefore could reasonably assume that defendant would be armed and capable of violence. Probable cause, as we have shown above, existed. Since the police were informed by Eric Thomas that defendant, his girl friend, lived in this apartment and it was one o'clock on a Saturday afternoon, there was strong reason to believe that the suspect was in the premises. Additionally, the police reacted quickly to the information supplied by Thomas on the morning of March 5 in proceeding directly to defendant's apartment. At her apartment, the police officers' entry was entirely peaceful. We conclude that the factors set forth above were established on balance, and exigent circumstances were present.

■■ Defendant next contends that the out-of-court identification procedures were impermissibly suggestive, and therefore, all identification evidence should have been suppressed. Under this general argument, defendant raises several issues. First, defendant asserts that the mere use of a photographic identification procedure when the defendant is in custody is *per se* impermissible. In support defendant relies on *People v. Williams* (1975), 60 Ill. 2d 1, 322 N.E.2d 819. In *Williams*, the supreme court stated:

> " '[P]hotographic identification procedures ought not to be employed when the suspect is in custody and a lineup is otherwise feasible' [citation] unless the police can offer extenuating circumstances justifying the use of photographic identification." (*People v. Williams* (1975), 60 Ill. 2d 1, 9, 322 N.E.2d 819, 824; see also *People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462; and *People v. Holiday* (1970), 47 Ill. 2d 300, 265 N.E.2d 634.)

The extenuating circumstances in *Williams* were that the witness had recently undergone surgery and that a trip from her home to the police station would be detrimental to her health. In response to this authority, the State refers to three appellate court cases: *People v. Witted* (1979), 79

Ill. App. 3d 156, 398 N.E.2d 68; *People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332; *People v. Dunagan* (1979), 71 Ill. App. 3d 972, 389 N.E.2d 1261. Our examination of these cases reveals that none of the three discusses *Williams* and its requirement of "extenuating circumstances." Although we find the State's reliance on these cases misplaced, we nevertheless believe there are sufficient extenuating circumstances here to justify the use of a photographic identification procedure. Defendant was taken into custody at approximately 1 p.m. on a Saturday. Investigator Crowle stated that he would have preferred to conduct a lineup but there were not suitable females presently in custody at the station. Thus, rather than hold defendant in custody until a lineup was feasible, a photographic identification procedure was employed. At the suppression hearing, defendant did not attack this position. Consequently, on this record, we feel that the mere use of a photographic identification procedure was not *per se* impermissible.

■■ Second, defendant contends that the failure to produce the photos used in the out-of-court photographic identification procedures should be held against the State. Thus, argues the defendant, any uncertainties involving the suggestive nature of this procedure must be resolved against the State. We have recently addressed this problem in *People v. Dallas* (1980), 85 Ill. App. 3d 153, 405 N.E.2d 1202. In that case, we stated:

> "Although it is exceptionally poor police procedure to not retain photographs used in a photographic display at which an identification is made, the law in Illinois is that photographs need not be produced in order to prove or disprove suggestiveness. (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) Suggestiveness may be demonstrated by testimony from the participants in the photographic display or by any other evidence relative to the inquiry. (*People v. Brown; People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142.) A conviction based on eyewitness identification at trial after a pretrial photographic identification will be reversed, however, only if the photographic display 'was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971." (*People v. Dallas*, 85 Ill. App. 3d 153, 172, 405 N.E.2d 1202, 1216.)

In the instant case, Investigator Crowle showed the victim an array of 12 or 13 photographs spread out across a desk top. The photographs were in color and depicted female blacks. Investigator Crowle made no suggestion to the victim before she viewed the photos. After viewing the array, Toth chose three photos as resembling her attacker, and from those three, she picked the defendant's photo as the one "most likely" to be her

attacker. We find nothing in this record which suggests that this procedure was suggestive.

■■ Next, defendant contends that the suggestive nature of the photographic identification procedure taints all subsequent identification of defendant by Toth. Our determination that the photographic identification was not suggestive necessarily results in rejection of this argument. (See *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.) Also, we reject defendant's argument that the subsequent lineup identification was impermissibly suggestive because defendant was the only person in the lineup whose photograph had previously been shown to Toth. *People v. Owens; People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142.

■■ Defendant's final argument with regard to this issue is that the "gross disparity in appearance" between herself and the other members of the lineup renders that procedure impermissibly suggestive. We disagree. Upon examining the photograph of the lineup, we feel that the differences in appearances between the participants in the lineup are not so significant as to cast doubt on the validity of the identification. In *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915, this court held that participants in a lineup need not be physically identical, and differences in size among them, provided it is not too great, are of little consequence. (See also *People v. Wyatt* (1974), 23 Ill. App. 3d 587, 319 N.E.2d 575.) In sum, we conclude that neither pretrial identification procedure was impermissibly suggestive, and therefore, the trial court properly denied defendant's motion to quash all identification evidence.

■■ Defendant's next argument involves the closing argument of the State. According to defendant, the State improperly commented on the appearance and demeanor of the defendant, and that the prosecutor's argument at one point contained a subtle note of racism. The State correctly pointed out, and the defendant has conceded, that neither of these comments was objected to at trial. Failure to object at trial to allegedly improper closing arguments waives those issues for appeal. (*People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.) Consequently, the plain-error rule forms the only basis for appellate review. (Ill. Rev. Stat. 1977, ch. 110A, par. 615.) In Illinois, the plain error concept forms a limited exception to the waiver rule and will be invoked only to correct grave errors or where the case is close factually and fundamental fairness requires review of the issue. (*People v. Currie* (1980), 84 Ill. App. 3d 1056, 405 N.E.2d 1142.) After a careful review of the closing arguments here, we do not believe review is necessary under the plain error rule.

Defendant next draws our attention to the trial court's handling of the jury during its deliberations and claims that the trial court committed four prejudicial errors during this period.

■■ Defendant first contends that it was error for the trial court not to give the *Prim* instruction when the jury first reported an impasse in their deliberations. The record does not disclose an objection by defendant to the trial court's direction to the jury that they continue their deliberations. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) Failure to object to an instruction or to the trial court's failure to give an instruction results in waiver of that issue for appeal. (*People v. Currie; People v. Buckley* (1976), 41 Ill. App. 3d 989, 355 N.E.2d 207.) Our supreme court has summarized the purpose of the waiver rule as follows:

> "The reason for this waiver rule, as stated in many of our appellate court cases, is that timely objections to defective instructions permit the court to correct the defects before the instructions are given, and do not therefore permit a party failing to object to gain the advantage of obtaining a reversal based upon his own failure to act." (*People v. Roberts* (1979), 75 Ill. 2d 1, 11, 387 N.E.2d 331, 336.)

We hold the waiver rule applies here and review of this issue under the plain error rule is not warranted.

Defendant contends that the trial court erred in not inquiring whether the jury had a reasonable probability of reaching a verdict after reporting that they were a hung jury and then when the jury reported the second time that they were hung, the court erred in giving the *Prim* instruction. The decision of whether to give the supplemental *Prim* instruction to a deadlocked jury rests within the sound discretion of the trial court. (*People v. Brown* (1977), 48 Ill. App. 3d 632, 362 N.E.2d 820.) In exercising its discretion, the trial court should primarily consider the length of time the jury had deliberated and the complexity of the issues the jury must decide. (*People v. Preston* (1979), 76 Ill. 2d 274, 391 N.E.2d 359.) The jury's own view of its ability to reach a verdict is only one factor to be considered by the trial court in the exercise of its discretion. (*People v. Allen* (1977), 47 Ill. App. 3d 900, 365 N.E.2d 460.) Whether a trial court abused its discretion in giving the *Prim* instruction is to be decided on a case-by-case basis. *People v. Brown.*

■■ Defendant contends that the trial court should have inquired whether there is a reasonable probability of the jury reaching a verdict. According to defendant, paragraph 5.4(c) of American Bar Association Standards Relating to Trial by Jury requires such a determination. We find defendant's reliance on this standard is misplaced. Under section 5.4(b) the trial court may give a proper deadlock instruction to the jury but shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals. Section 5.4(c) states: "The jury may be discharged without having agreed upon a verdict

if it appears that there is no reasonable probability of agreement." Then, under the unequivocal language of these actions, the inquiry into whether there is a "reasonable probability of agreement" is relevant only to the decision to discharge the jury, and not to the decision to give a deadlock instruction.

■■ Next, when the jury returned to the court a second time, it informed the trial court: "We are a hung jury. No matter how long we deliberate our polled vote is eight guilty, two not guilty, two undecided." The trial court then gave the jury a supplemental deadlock instruction which was consistent with the guidelines set forth in *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731. While the record is unclear, the jury apparently had deliberated for approximately six to seven hours when the *Prim* instruction was given. The issues in this case involved the victim's identification of the defendant and the defendant's alibi as told by two witnesses. The jury made the determination after further deliberations and resolved them in favor of the victim. Upon this record, we cannot say that the trial court abused its discretion by giving the *Prim* instruction at this point.

■■ With regard to the trial court's decision to sequester the jury overnight, defendant maintains, in a purely conclusionary fashion, that it had a coercive effect on the jury. Initially, we note that defendant failed to object specifically to the decision at the time it was made. In addition, we can find no support for the defendant's conclusion that this action coerced the jury. The trial court committed no error in this regard.

Defendant's final contention upon appeal is that she was not convicted beyond a reasonable doubt. Defendant contends that Claire Toth did not have an adequate opportunity to observe the woman who stabbed her and that several minor discrepancies in the testimony raise a reasonable doubt of her guilt. She also points out the allegedly strong alibi testimony in her behalf. We have carefully reviewed the record and find that the evidence adduced therein supports defendant's conviction beyond reasonable doubt.

■■ A reviewing court will not set aside a jury's verdict unless the evidence is so improbable or palpably contrary to the verdict as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Where the identification of the accused is at issue, a positive identification by a single witness, who had ample opportunity for observation, will be sufficient to sustain the conviction. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) It is the function of the trier of fact to determine the credibility of the witnesses and the weight to be given to their testimony and the inferences to be drawn therefrom. (*People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) Any discrepancies or conflicts in the testimony affect only the weight to be given the testimony, and the trier of fact is free to accept or reject as much or as little as it pleases of a

witness' testimony. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) The conviction will stand even though the testimony of the identification witness is contradicted by the defendant's alibi witnesses. (*People v. Alexander* (1978), 65 Ill. App. 3d 559, 382 N.E.2d 519.) Where the evidence is merely conflicting, a court of review will not disturb the judgment of the trier of fact. *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.